(No. 15053.—Decree affirmed.)

REBECCA D. WILLIAMSON, Plaintiff in Error, *vs.* DAVID D. WILLIAMSON, Defendant in Error.

*Opinion filed February 21, 1923.*

1. DEEDS—*when conveyance from parent to child will be closely scrutinized.* Where a parent who is old and feeble in body and mind conveys all her property to a child, courts will closely scrutinize the transaction to determine whether it was fair and unaffected by undue influence of the child, as a conveyance under such circumstances must be free from suspicion.

2. SAME—*when a deed from mother to her son will not be set aside.* A mother will not be allowed to set aside a deed to her son, even though it has been recorded contrary to her expressed wish when it was delivered, where the proof shows that the deed was her own voluntary act and was not procured by fraud or undue influence and where a similar provision for the son had been made in a will, on the strength of which she allowed the son to make lasting and valuable improvements on the lands.

3. SAME—*when alteration after delivery does not affect validity of deed.* Where a mother, after delivery of a deed to her son, is dissatisfied because the deed made no provision for her in case of the son's death, an alteration by the grantee inserting a provision that the grantor shall "have the use, control, possession and profits of said described premises during her natural life" is valid and binding when submitted to and approved by the grantor and does not affect the validity of the deed.

4. SAME—*when recording a deed contrary to wish of grantor does not render it void.* The recording of a deed is not essential to vest title in the grantee but merely serves as notice of the title in the grantee, and where a mother executes and delivers a deed to her son without the reservation of any right to recall it, the fact that it is recorded by the grantee against the expressed oral wish of the grantor at the time of delivery that it "is not to be recorded while I live" will not render the deed void.

WRIT OF ERROR to the Circuit Court of Perry county; the Hon. J. F. GILLHAM, Judge, presiding.

B. W. POPE, for plaintiff in error.

J. PAUL CARTER, for defendant in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

This writ is to review a decree of the circuit court of Perry county dismissing a bill filed by complainant, Rebecca D. Williamson, against her son, David D. Williamson, to set aside a deed to forty acres of land executed by her to defendant February 14, 1917. The bill alleged complainant was at the time the deed was made, and had been for some time prior, very sick; that she and defendant and his wife were living on the land; that it had been her home for several years; that she was ill, weak and feeble in body and mind; that she did not understand what she was doing; that defendant, without her knowledge, caused the deed to be prepared and brought it to her when she was so weak she had to be propped up in bed, and told her to sign it; that she never had the deed in her possession, but it was taken possession of by defendant, who without her knowledge caused it to be recorded March 23, 1921; that after she had recovered somewhat from her illness she requested defendant to return the instrument she had signed, to her, but he refused to do so; that he is in possession and control of the land, and because of his mistreatment she has been compelled to leave her home and live with relatives; that she is seventy-five years old, has no other property than the land, and is entirely dependent on relatives for support; that she never desired to convey the land to defendant, and the deed was fraudulently and wrongfully procured by him. She prays that it be set aside and that defendant be required to execute and deliver to her a deed to the premises. A copy of the deed is attached to the bill.

Defendant answered the bill, denying he had the deed prepared without complainant's knowledge and consent, and avers she requested him to get Dr. Holman, her attending physician, who was a notary public, to prepare the deed. The answer denies complainant did not know what she was doing when she signed the deed, and avers it was executed pursuant to plans and purposes she entertained for many

years; that she had years before made a will devising the land to defendant but requiring him to pay his sister, Rebecca Dodilett, $200; that she was dissatisfied with the will, destroyed it and made the deed in place of it, and at her request he gave Rebecca a note for $300, which he afterwards paid. The answer at some length sets out improvements made on the land by defendant, and denies complainant, soon after the deed was made, asked him to return it. He admits that after it was recorded, in March, 1921, the complainant asked for the return of the deed. The answer avers he rented the land from complainant after the deed was made for $100 per year and payment of half the taxes; that he kept up the repairs and supported complainant until she left his home a few weeks before bringing the suit, and denies the deed was procured wrongfully or by fraud.

The cause was heard on oral testimony before the chancellor and a decree entered dismissing the bill for want of equity, to reverse which decree this writ of error is sued out.

Complainant in her testimony denied she had contemplated or suggested making the deed; that it was brought to her while she was sick in bed, by defendant and Dr. Holman, the notary public who took the acknowledgment. She testified making the deed had not been previously discussed between her and defendant; that she did not know it was a deed or what the instrument was but signed it because defendant told her to, and he took it away. Dr. Holman was her attending physician, and his daughter, Mrs. Chapman, accompanied him to witness the execution of the deed. Dr. Holman is dead, and Mrs. Chapman testified complainant was sick in bed; that she signed the deed while propped up, but witness did not know who brought the deed there for her to sign. She heard no conversation before or at the time the deed was signed.

Defendant claimed and alleged in his answer that the deed was made pursuant to suggestions and plans of com-

plainant, which she had entertained for several years, to give him the land. The evidence shows she made a will in 1901 devising the land to defendant. The will required him to pay his sister Rebecca, who was then unmarried, $200 in partial payments as she attained certain ages. The will appears to have been drawn by and left in the possession of James Watts, a lawyer in Nashville, Illinois. Complainant testified she never sent any letters to Watts and that he never made a will for her. In this she was evidently mistaken. Defendant introduced a letter from her to Watts, dated September 2, 1901, giving him instructions about preparing a deed to defendant for another forty acres of land and also a will devising the forty in controversy to defendant, and requiring him to pay his brother, William, $50, his sister Ella $25, and his sister Rebecca $200, in installments of $50 each upon her attaining certain years of age. Defendant testified that three or four days before the deed was executed complainant told him she and her daughter Rebecca had talked the matter over and were not satisfied with the will; that they wanted complainant to make defendant a deed, for fear the other heirs might break the will. Complainant wrote a note to Watts and sent defendant with it, requesting Watts to send her the will. Defendant got the will, read it to complainant, and at her request put it in the stove and burned it. His sister Rebecca was there when he brought the will. Complainant told him to get Dr. Holman to prepare the deed. Dr. Holman said he had no blanks, and defendant went to Pinckneyville and got the deed prepared there by John Roe. This was done the 13th of February, and on the 14th defendant, at complainant's request, secured Mrs. Chapman, a daughter of Dr. Holman, to come with her father to witness the execution of the deed. Defendant testified Dr. Holman read the deed to complainant and asked her if she was making it of her own free will, and she said she was. When she signed it she gave it to defendant and said, "That is not to be re-

corded while I live." Defendant laid it on the book-case, where it remained until the first time he went to Pinckney-ville, when he took it there and placed it in his safety deposit box in the bank. About a month after the deed was made defendant testified complainant told him she believed she should not have made the deed; that if he and his wife died she would be out of a home. He told her that was true and that he would fix it so as to protect her. He went to Pinckneyville, took the deed out of his box, took it to the man who prepared it and asked what he could do,— whether it would be legal to put a clause in the deed. He informed him it would, and the following clause was written in the deed: "The grantor to have the use, control, possession and profits of said described premises during her natural life." Defendant testified he took the deed home with him as changed, showed it to complainant and asked her if it suited her. She replied it did, and the deed was put on the book-case in the living room, where it laid until defendant went to Pinckneyville again, five or six days afterwards. Defendant proved the payment to his sister Rebecca of the $300 note. He testified he paid complainant $100 a year rent for the land, furnished her support, and after the will was made he made extensive and valuable improvements upon the land. Some of these improvements were made after the deed was executed, but most of them, as we understand it, were made before the deed was made and after the will was executed. Among the improvements testified to were building a six-room house, two barns, a silo, fences, and putting out three acres of orchard. Defendant testified he paid the cost of all these improvements himself, which together in full amounted to a very considerable sum of money.

Complainant testified she left the home because of ill-treatment, but she is not supported in this by other testimony. Defendant denied any ill-treatment, and several men who had worked for him, and neighbors who had vis-

ited at the house, testified there never was any unkind treatment toward the complainant so far as they observed, and there was no proof that she ever made any complaint of the treatment given her. She was taken away from the home in August by her son William and daughter Rebecca, and the bill was filed in October following. Defendant testified he had no knowledge that she was going to leave.

Complainant paid most of the taxes on the land. Defendant paid part of them, but just what part we do not find stated in the record. Complainant acquired her title to the forty acres in question and the other forty she had previously conveyed to defendant from her mother as a gift, subject to a mortgage of $183. Complainant claimed to have paid that mortgage off, and defendant testified it was paid from the proceeds of his labor. He was forty-four years old at the time of the trial and testified he was twenty-nine years old when he married. Complainant testified the forty acres she first deeded to defendant was to pay him for labor he had performed since he was twenty-one years old. It is true, complainant was very ill at the time she made the deed, but there is no proof to support the claim that she was not mentally capable of knowing and understanding what she was doing. The original deed has been certified up for our inspection, and her signature is written in a very neat and legible manner,—much better than the average signature,—and does not indicate any extreme physical weakness. We think the proof warrants the conclusion that complainant knew at the time she was executing a deed; that it was done of her own free will, and was not secured by wrongful influence or conduct of the grantee.

The note for $300 given by defendant to Rebecca, which he paid, was payable "one year after deed is recorded."

Complainant was seventy-four years old at the time the deed was executed, and she, defendant and his wife were living together on the land. It is true, as argued by counsel for complainant, that when a parent who is old and

feeble in body and mind conveys all her property to a child, courts will scrutinize the transaction very closely to determine whether it was fair and unaffected by undue influence of the child. A conveyance under such circumstances must be free from suspicion. These principles are so universally declared and so well understood that it is not necessary to cite the decisions. The proof shows complainant and defendant had always lived together on the land; that defendant was an industrious, capable manager of the farm, which was not a very valuable one independent of the improvements defendant placed on it. Defendant testified, and it is admitted, he paid complainant $100 a year rent for the land. He had previously paid crop-rent of one-third, but at complainant's request it was changed to $100 a year. He testified he provided the necessary support for complainant, and there is no proof she had any independent income. We cannot escape the conviction that the proof shows the complainant knew what she was about when she made the deed; that it represented her wish and intention at the time; that it was her own voluntary act and was not procured by the fraud or undue influence of defendant. The proof is convincing that after she made the will, in 1901, the land was practically regarded by her as the property of defendant, subject to her receiving the income from it, and that she and not defendant became dissatisfied with the will and proposed the making of the deed. Under these circumstances she saw defendant, after the will was made, investing his money and labor in lasting and valuable improvements under the belief that he was or would be the owner of the land. No offer was made by complainant to compensate defendant for these improvements, and to set aside the deed without any reimbursement for the value he had added to the land by the improvements, would, under the circumstances, be inequitable. In any event, before the deed could be set aside a court of equity would require an allowance to be made to defendant for the value the im-

provements he had made added to the land. *Lagger* v. *Mutual Union Loan Ass'n,* 146 Ill. 283; *Cable* v. *Ellis,* 120 id. 136.

Counsel for complainant says that even if the deed was valid when executed the alteration was void, and if the deed was invalid the alteration did not make it valid. In *Stiles* v. *Probst,* 69 Ill. 382, the court said: "It is a well settled rule that an alteration, even in a material part, may be made in a deed or note after execution, if it is proved or may be presumed to have been done by consent of all the parties and they are competent to contract." In *Abbott* v. *Abbott,* 189 Ill. 488, it was held if both parties to a deed consent to the substitution of another person as grantee after delivery the deed will be valid if it is again delivered after the alteration. If the deed was a valid conveyance when it was executed, as we hold the proof shows it was, the subsequent alteration by consent of the grantor and grantee did not invalidate the title conveyed. The alteration was for the benefit of the grantor and is binding on the grantee. The alteration was made about a month after the deed was executed and was submitted to and approved by complainant. The deed was not recorded until March 23, 1921.

Complainant testified the deed was not to be recorded while she lived, and defendant admits she so stated when the deed was executed and delivered. On cross-examination of defendant he testified the reason why he had the deed recorded was that a neighbor told him he was a fool if he did not have it recorded. No other condition was attached to the delivery of the deed than that it was not to be recorded while the grantor lived. The title passed when the deed was executed and delivered without the reservation of any right to recall it. Recording the deed was not essential to vest the title in the grantee but served as notice to others that the title was in defendant.

It is deplorable that this old mother and her son became involved in this controversy, but under the proof and the

law we are of opinion the chancellor, who heard the testimony in open court, correctly found and decreed that the equities of the case are with defendant and dismissed the bill.

The decree is affirmed.

*Decree affirmed.*

---

(No. 15012.—Reversed and remanded.)
Marcin Szymczak *vs.* Waleryja Szymczak *et al.* Appellees.—(Mary Szymczak, Appellant.)

*Opinion filed February 21, 1923.*

1. Deeds—*when joint tenancy is severed by deed.* A joint tenancy is severed by a deed by one joint tenant to a stranger, and a re-conveyance by the stranger to said joint tenant does not have the effect of re-establishing the joint tenancy.